14CV003722

# STATE OF NORTH CAROLINA

Wake County

FILED

2014 MAR 24 PM 12: 11

WAKE COUNTY, C.S.C.

BY

File No.

In The General Court Of Justice
☐ District ☒ Superior Court Division

## GENERAL

## CIVIL ACTION COVER SHEET

☒ INITIAL FILING ☐ SUBSEQUENT FILING

Rule 5(b), General Rules of Practice For Superior and District Courts

*Name And Address Of Plaintiff 1*
Epic Games, Inc.
c/o Hunton & Williams, LLP
421 Fayetteville Street, Suite 1400
Raleigh, NC 27601

*Name And Address Of Plaintiff 2*

**VERSUS**

*Name Of Defendant 1*
Timothy Frederick Murphy-Johnson
1332 California St #2
San Francisco, CA 94109

*Summons Submitted* ☐ Yes ☒ No

*Name Of Defendant 2*

*Summons Submitted* ☐ Yes ☐ No

☐ Jury Demanded In Pleading
☐ Complex Litigation

*Name And Address Of Attorney Or Party, If Not Represented (complete for initial appearance or change of address)*
Douglas W. Kenyon
HUNTON & WILLIAMS LLP
421 Fayetteville Street, Suite 1400
Raleigh, NC 27601

*Telephone No.* 919.899.3000
*Cellular Telephone No.*

*NC Attorney Bar No.* 13242
*Attorney E-Mail Address* dkenyon@hunton.com

☒ Initial Appearance in Case ☐ Change of Address

*Name Of Firm* HUNTON & WILLIAMS LLP

*FAX No.* 919.833.6352

*Counsel for*
☒ All Plaintiffs ☐ All Defendants ☐ Only *(list party(ies) represented)*

☐ Amount in controversy does not exceed $15,000
☐ Stipulate to arbitration

## TYPE OF PLEADING

*(check all that apply)*

☐ Amend (AMND)
☐ Amended Answer/Reply (AMND-Response)
☐ Amended Complaint (AMND)
☐ Assess Costs (COST)
☐ Answer/Reply (ANSW-Response) *(see Note)*
☐ Change Venue (CHVN)
☐ Complaint (COMP)
☐ Confession Of Judgment (CNJF)
☐ Consent Order (CONS)
☐ Consolidate (CNSL)
☐ Contempt (CNTP)
☐ Continue (CNTN)
☐ Compel (CMPL)
☐ Counterclaim (CTCL) *Assess Court Costs*
☐ Crossclaim *(list on back)* (CRSS) *Assess Court Costs*
☐ Dismiss (DISM) *Assess Court Costs*
☐ Exempt/Waive Mediation (EXMD)
☐ Extend Statute Of Limitations, Rule 9 (ESOL)
☐ Extend Time For Complaint (EXCO)
☐ Failure To Join Necessary Party (FJNP)

*(check all that apply)*

☐ Failure To State A Claim (FASC)
☐ Implementation Of Wage Withholding In Non-IV-D Cases (OTHR)
☐ Improper Venue/Division (IMVN)
☐ Including Attorney's Fees (ATTY)
☐ Intervene (INTR)
☐ Interplead (OTHR)
☐ Lack Of Jurisdiction (Person) (LJPN)
☐ Lack Of Jurisdiction (Subject Matter) (LJSM)
☐ Modification Of Child Support In IV-D Actions (MSUP)
☐ Notice Of Dismissal With Or Without Prejudice (VOLD)
☐ Petition To Sue As Indigent (OTHR)
☐ Rule 12 Motion In Lieu Of Answer (MDLA)
☐ Sanctions (SANC)
☐ Set Aside (OTHR)
☐ Show Cause (SHOW)
☐ Transfer (TRFR)
☐ Third Party Complaint *(list Third Party Defendants on back)* (TPCL)
☐ Vacate/Modify Judgment (VCMD)
☐ Withdraw As Counsel (WDCN)
☒ Other *(specify and list each separately)*
APPLICATION FOR JUDICIAL RELIEF AND TO ENJOIN ARBITRATION

**NOTE:** *All filings in civil actions shall include as the first page of the filing a cover sheet summarizing the critical elements of the filing in a format prescribed by the Administrative Office of the Courts, and the Clerk of Superior Court shall require a party to refile a filing which does not include the required cover sheet. For subsequent filings in civil actions, the filing party must either include a General Civil (AOC-CV-751), Motion (AOC-CV-752), or Court Action (AOC-CV-753) cover sheet.*

AOC-CV-751, Rev. 1/14 (Over)
© 2014 Administrative Office of the Courts

## CLAIMS FOR RELIEF

- [ ] Administrative Appeal (ADMA)
- [ ] Appointment Of Receiver (APRC)
- [ ] Attachment/Garnishment (ATTC)
- [ ] Claim And Delivery (CLMD)
- [ ] Collection On Account (ACCT)
- [ ] Condemnation (CNDM)
- [ ] Contract (CNTR)
- [ ] Discovery Scheduling Order (DSCH)
- [x] Injunction (INJU)
- [ ] Limited Driving Privilege - Out-Of-State Convictions (PLDP)
- [ ] Medical Malpractice (MDML)
- [ ] Minor Settlement (MSTL)
- [ ] Money Owed (MNYO)
- [ ] Negligence - Motor Vehicle (MVNG)
- [ ] Negligence - Other (NEGO)
- [ ] Motor Vehicle Lien G.S. 44A (MVLN)
- [ ] Possession Of Personal Property (POPP)
- [ ] Product Liability (PROD)
- [ ] Real Property (RLPR)
- [ ] Specific Performance (SPPR)
- [ ] Other *(specify and list each separately)*

| *Date* | *Signature Of Attorney/Party* |
|---|---|
| | |

**FEES IN G.S. 7A-308 APPLY**
Assert Right Of Access (ARAS)
Substitution Of Trustee (Judicial Foreclosure) (RSOT)
Supplemental Procedures (SUPR)

**PRO HAC VICE FEES APPLY**
Motion For Out-Of-State Attorney To Appear In NC Courts In A Civil Or Criminal Matter (Out-Of-State Attorney/Pro Hac Vice Fee)

| No. | ☐ Additional Plaintiff(s) |
|---|---|
| | |
| | |
| | |
| | |
| | |

| No. | ☐ Additional Defendant(s) ☐ Third Party Defendant(s) | Summons Submitted |
|---|---|---|
| | | ☐ Yes ☐ No |
| | | ☐ Yes ☐ No |
| | | ☐ Yes ☐ No |
| | | ☐ Yes ☐ No |
| | | ☐ Yes ☐ No |

*Plaintiff(s) Against Whom Counterclaim Asserted*

*Defendant(s) Against Whom Crossclaim Asserted*


© 2014 Administrative Office of the Courts

STATE OF NORTH CAROLINA

COUNTY OF WAKE

FILED 2014 MAR 24 PM 12:11

C.S.C.

BY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
14-CVS-__________

| | | |
|---|---|---|
| EPIC GAMES, INC.,<br><br>Movant,<br><br>v.<br><br>TIMOTHY FREDERICK MURPHY-JOHNSON,<br><br>Respondent. | ) | **APPLICATION FO JUDICIAL RELIEF AND ENJOIN ARBITRATION** |

Epic Games, Inc., by counsel and pursuant to the North Carolina Revised Uniform Arbitration Act, N.C. Gen. Stat. §1-569.1 *et seq.*, moves to enjoin arbitration initiated by Timothy Frederick Murphy-Johnson. Mr. Johnson seeks arbitration of disputes that are not subject to an agreement to arbitrate. Epic states the following in support of its motion:

## **Facts**

1. Epic is a Maryland corporation with its principal place of business in Cary, North Carolina.

2. Mr. Johnson is a former employee of Epic. He worked for Epic in Cary, North Carolina.

3. Epic terminated Mr. Johnson's employment in 2006. He did not object at the time or in the ensuing eight years.

4. Eight years after his discharge, in 2014, Mr. Johnson initiated arbitration against Epic with the American Arbitration Association. The arbitration is styled *Timothy Frederick*

*Murphy-Johnson v. Epic Games, Inc.*, AAA Case No. 50-166-T-00223-14. A copy of Mr. Johnson's arbitration demand (without exhibits) is attached as Exhibit A.

5. Mr. Johnson seeks to arbitrate in North Carolina. *See* Demand ¶2.

6. Mr. Johnson initiated the arbitration pursuant to his former Employment Agreement with Epic. The Employment Agreement is governed by North Carolina law.

7. The Employment Agreement contains the following arbitration clause that appears as ¶11(c):

> Any disputes between Employee and Epic in any way concerning his employment this Agreement or this Agreement's enforcement, including the applicability of this Paragraph, shall be submitted at the initiative of either party to mandatory arbitration before a single arbitrator and conducted pursuant to the rules of the American Arbitration Association applicable to the arbitration of employment disputes then in effect, or its successor, provided however, that this Paragraph does not apply to the Confidentiality Obligations and Intellectual Property Rights Agreement referred to in Paragraph 7, and attached as Exhibit A. The decision of the arbitrator may be entered as judgment in any court of the State of North Carolina.

8. Mr. Johnson seeks to arbitrate whether Epic breached the Employment Agreement. That claim is time-barred under the three-year limitations period in N.C. Gen. Stat. §1-52(1).

9. Mr. Johnson also seeks to arbitrate four additional disputes that are not subject to an arbitration agreement.

10. The first of those non-arbitrable disputes is the third cause of action in Mr. Johnson's arbitration demand. That cause of action asserts that the "majority shareholders of Epic" allegedly took advantage of Mr. Johnson (Demand ¶34) and allegedly took actions that "were not made for legitimate business reasons and did not constitute the exercise of good corporate judgment." (Demand ¶35). That dispute is outside the scope of the Employment Agreement's arbitration clause, which is limited to certain disputes "between Employee [Mr.

Johnson] and Epic." The third cause of action is not a dispute between Mr. Johnson and Epic. If anything, it is a dispute between Mr. Johnson and the majority shareholders, and thus is not subject to the Employment Agreement's arbitration clause.

11. The second non-arbitrable dispute is Mr. Johnson's claim for stock or its monetary value under the Stock Option Agreement. *See* Arbitration Demand, Prayer for Relief ¶2. The Option Agreement is a separate contract between Epic and Mr. Johnson. Unlike the Employment Agreement, the Option Agreement is governed by Maryland law and does not contain an arbitration clause. Any claim for breach of the Option Agreement is not subject to arbitration.

12. The third non-arbitrable dispute is Mr. Johnson's request for a declaration that "any copyright or other intellectual property assignment" he gave to Epic be declared "null and void." *See* Demand, Prayer for Relief ¶3. Mr. Johnson assigned various rights to Epic pursuant to three contracts: (1) the Reality Engine Acquisition Agreement; (2) the Residual Rights Acquisition Agreement; and (3) the Confidentiality Obligations and Intellectual Property Rights Agreement. The first two of those contracts are separate from the Employment Agreement and do not contain arbitration clauses. While the Confidentiality Obligations and Intellectual Property Rights Agreement is an attachment to the Employment Agreement, the Employment Agreement's arbitration clause expressly states that it "does not apply to the Confidentiality Obligations and Intellectual Property Rights Agreement." Employment Agreement ¶11(c).

13. The fourth non-arbitrable dispute is Mr. Johnson's request for a declaration that any copyright or intellectual property assignment from Artificial Studios, Inc. to Epic be declared "null and void" (Demand, Prayer for Relief, ¶3) and that he be awarded Artificial Studios, Inc.'s "lost profits" (*Id.* at ¶4). The demand does not explain why Artificial Studios is

entitled to void its assignments to Epic and recover lost profits. Whatever its putative basis, though, the claim is not a dispute between Mr. Johnson and Epic. If anything, it is a dispute between Artificial Studios, Inc. and Epic. No arbitration agreement allows Mr. Johnson to demand arbitration of any such claim.

**Grounds**

14. N.C. Gen. Stat. §1-569.6 directs that "[t]he court shall decide whether an agreement to arbitrate exists or a controversy is subject to an agreement to arbitrate."

15. N.C. Gen. Stat. §1-569.7 authorizes the court to enjoin arbitration of claims or disputes that are not subject to arbitration.

16. The controversies identified in paragraphs 8 through 13 above are not subject to an agreement to arbitrate, and Epic does not consent to arbitration of them.

WHEREFORE Epic requests that the Court enjoin Mr. Johnson's arbitration and grant Epic such further relief as the Court deems appropriate.

Dated this 24th day of March 2014.

HUNTON & WILLIAMS LLP
*Attorneys for Epic Games, Inc.*

Douglas W. Kenyon (N.C. Bar No. 13242)
HUNTON & WILLIAMS LLP
421 Fayetteville Street, Suite 1400
Raleigh, NC 27601
Telephone: 919.899.3000
Facsimile: 919.833.6352
*dkenyon@hunton.com*

Ryan G. Rich (N.C. Bar No. 37015)
HUNTON & WILLIAMS LLP
101 South Tryon Street, Suite 3500
Charlotte, North Carolina 28280
Telephone: 704.378.4778
Facsimile: 704.331.5143
*rrich@hunton.com*

Michael R. Shebelskie
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219-4074
Telephone: 804.788.8716
Facsimile: 804.788.8218
*mshebelskie@ hunton.com*
*Pro Hac Vice Pending*

# EXHIBIT A

Chad A. McGowan
William A. McKinnon
MCGOWAN, HOOD & FELDER, LLC
1539 Health Care Dr.
Rock Hill, SC 29732
Telephone: (803) 327-7800
Facsimile: (803) 328-5656
cmcgowan@mcgowanhood.com
bmckinnon@mcgowanhood.com

Alan E. Engle
MEADOR & ENGLE
155 N. Riverview Dr., Suite 313
Anaheim Hills, CA 92808
Telephone: (310) 428-6985
Facsimile: (714) 386-5368
alan.engle@meenlegal.com

Attorneys for Claimant

**AMERICAN ARBITRATION ASSOCIATION**

**NORTH CAROLINA**

| | |
|---|---|
| TIMOTHY FREDRICK MURPHY-JOHNSON,<br><br>Claimant,<br>v.<br><br>EPIC GAMES, INC.<br><br>Respondent. | Case No.:<br><br>DEMAND FOR ARBITRATION FOR BREACH OF CONTRACT; BREACH OF GOOD FAITH AND FAIR DEALING; AND BREACH OF FIDUCIARY DUTY |

Claimant Timothy Fredrick Murphy-Johnson ("Tim Johnson") brings this Complaint against respondent Epic Games, Inc. for damages and injunctive relief under the laws of North Carolina and the United States, as follows:

## JURISDICTION AND VENUE

1. This action arises from the breach of an Employment Agreement ("Agreement") between Epic Games and Tim Johnson. A true and correct copy of the Agreement is attached hereto as Exhibit A. Among other things, the Agreement calls for arbitration of "[a]ny disputes between Employee and Epic in any way concerning his employment, this Agreement or this Agreement's Enforcement...before a single arbitrator and conducted pursuant to the rules of the American Arbitration Association." Agreement at ¶11(c). Under the terms of the Employment Agreement, the arbitration is to be conducted under the AAA Employment Arbitration Rules in effect as of March 2006.

2. Venue in North Carolina is proper based on the provision of the Agreement that: "[t]he decision of the arbitrator may be entered as judgment in any court of the State of North Carolina." Agreement at ¶11(c).

## PARTIES

3. Claimant Timothy Fredrick Murphy-Johnson is a citizen of the United Kingdom and resident of the United States. He resides in San Francisco, California. Mr. Johnson founded a successful software company, Artificial Studios, while in college in the United Kingdom. The primary product offered by Artificial Studios was the Reality Engine, a three-dimensional physics and rendering engine that game designers could use to build computer games. The Reality Engine is a sophisticated software product that enabled game designers to focus on the creative aspects of their games without having to develop the expertise and do the work of creating the underlying physics and structure of the game world.

4. Respondent Epic Games, Inc. is a Maryland corporation founded by Timothy Sweeney located in Cary, North Carolina. On information and belief, in 2012, Tencent

Holdings, a Chinese company, acquired approximately 48.4% of Epic for $330 million, giving Epic a value of approximately $700 million dollars. One of Epic's most successful products over the last 15 years has been the Unreal Engine, a physics and rendering engine used in many popular video games, such as the Gears of War franchise.

## FACTUAL ALLEGATIONS

5. From approximately 2003 to 2005, Artificial Studio's Reality Engine was very successful, with revenues approaching over $200,000 per month in 2005. It was a competitor and lower cost alternative to Epic's Unreal Engine. In early 2005, Mr. Johnson and Mr. Sweeny, the founder and controlling shareholder of Epic, exchanged various emails that ultimately led to Epic purchasing Artificial Studios and the Reality Engine and hiring Mr. Johnson. (Exhibit B, January 30 Sweeney-Johnson Emails.)

6. Rather than simply taking direct payment for the sale of his company and its software, Mr. Johnson agreed to a package that included employment with Epic, retention and performance bonuses, a $250,000 payment, and stock options that vested over a period of four years. The options Mr. Johnson was to receive under the Employment Agreement and related Stock Option Agreement represented 1% of Epic's outstanding and committed shares. (Exhibit C, Summary of Stock Ownership in Epic Games, Inc. as of April 2005).

7. Even though Mr. Johnson was young, unsophisticated in legal matters, and from another county, he recognized that if Epic terminated him before his options vested he ran the risk of being deprived of most of the compensation for the sale of Artificial Studios. Therefore, a central focus of negotiations over approximately 70 pages of six separate contracts, including the Reality Engine Acquisition Agreement, the Residual Rights Acquisition Agreement, the Confidentiality & IP Rights Agreement, the Non-Competition Agreement, the Stock Option Agreement, and Mr. Johnson's Employment Agreement, were the grounds upon which Mr. Johnson could legally be terminated by Epic. (Artificial Studios Sale Documents, attached hereto as

Exhibit D).

8. Negotiations for the sale and related agreements began in March 2005. The general outlines of the deal were negotiated between Mr. Johnson, then 21 years old, and Tim Sweeney, the founder and largest shareholder of Epic, and Mike Capps, the President of Epic. Even at the earliest stages of negotiations, Mr. Johnson emphasized that he was concerned Epic could potentially unfairly deprive him of his stock options. He wrote to Mr. Sweeney that, "Also, regarding the stock options, would you be prepared to vest these over my "with cause" period of three years (or make the period four years), which would alleviate my fear that I'd be shut out before my stock has vested." (Exhibit E, March 18-22 Johnson-Sweeney Emails, "Subject: Chat with Mike Capps".) Mr. Sweeney wrote back that the vesting over time was mainly to "incentivize you to stay" at Epic. *Id.* Mr. Sweeney proposed that, "One possibility would be to make a distinction between what happens if Epic were to boot you out without cause (which you don't want to happen), versus if you decided to leave the company on your own (which we don't want to happen)." *Id.* What Mr. Johnson did not foresee is that Epic might falsely claim to fire him "for cause" without regard to the terms of his Employment Agreement.

9. As negotiations progressed, Mr. Johnson again raised similar concerns over the phone and via email with Mr. Capps, Epic's President. Mr. Johnson noted that, "I'd expect that my vested stock options are untouchable whether I'm fired (with or without cause) or quit, and that there is no expiry on them, so I can exercise them in 10 years if I'd like. **This is what Tim [Sweeney] told me, and having this long-term stake in Epic is absolutely vital to me in terms of the financial sense of this deal and my motivation to see Epic grow."** (Exhibit F, March 26-27 Johnson-Capps Emails, "Subject: RE: down to the details?", emphasis added.) Mr. Capps responded in part, "Regarding worrying about us screwing you over -- remember I am considering 80% of your value to be the value you bring to our engine and our company over the next ten years. If I screw you over, or if you even think I'm screwing you over, your

productivity will be zero, and you're going to leave, and then I'll have hurt Epic substantially." *Id.*

10. After the broad outline of the deal was reached, Mr. Johnson retained a lawyer recommended and paid for by Epic. While most of the remaining negotiations were handled through counsel based on contacts drafted by Epic, Mr. Johnson exchanged various emails with Mr. Capps regarding important details. After receiving an initial draft of the sale documents and Employment Agreement from Epic, Mr. Johnson wrote to Mr. Capps that:

> My lawyer's been explaining to me that "for cause" termination is not something I should count on as ensuring I will be employed, as so long as the determination of cause rests on Epic you can terminate me and the burden of proof would be on me, which means I'd have to litigate at a cost that would be prohibitive. Therefore while he thinks that's "fair" for purely employment terms, he said it's not very sensible to tie the $75K and stock options related to the deal to employment in this way if I feel this is part of the value for selling my company.
>
> **My first question is therefore whether you're prepared to narrow "for cause" to what we initially agreed, namely that I'd have to commit some crime or other malicious act or act of total incompetence, and the burden of proof in "for cause" termination rests on Epic, not me. This means you'd have to prove it in court if a dispute arose. If you don't want to do this for whatever reason, could we better balance out the initial deal by either having the stock options upfront, or perhaps exchanging some of the guaranteed bonus amounts for a higher IP purchase?**
>
> To clarify, this is something my lawyer suggested I discuss directly with you, as it falls outside the scope of the contractual wording he's working through with Jay.

(April 20, 2005 Johnson-Capps Email, emphasis added, attached hereto as Exhibit G.)

11. Epic's Vice President of Business Development, Jay Wilbur, responded to Mr. Johnson's concerns by agreeing to restrict the termination provision of the Employment Agreement. Mr. Wilbur wrote:

> Our goal is to have you join the Epic family. What you read in the

employment agreement is that same for all Epic employees. I'm willing to consider changes but I need a little something back for it.

I'll give you the narrower "for cause" if you give me the Reality Engine marks, domains, websites, etc. as part of that assignment.

(April 20, 2005 Wilbur-Johnson Email, attached hereto as Exhibit H.)

12. In response to Mr. Wilbur's request, Mr. Johnson agreed to transfer the rights Epic requested with regard to the Reality Engine trademarks and intellectual property. Pursuant to the deal, the language of the "Termination For Cause" provision of the Employment Agreement was significantly limited, including the addition of a provision that termination for cause would require, "willful and continual failure to substantially perform his duties with Employer (other than a failure resulting from employee's disability) and such failure continues after written notice to Employee providing a reasonable description of the basis for the determination that Employee has failed to perform his duties." (Exhibit A, Final Employment Agreement at ¶7(b)).

13. The restrictive termination provision of the final Employment Agreement contrasts starkly with the language of the initial draft agreement Mr. Capps sent Mr. Johnson on April 6, 2005 and was a key component of the sale of the Reality Engine and attendant copyright transfer. (Exhibit I, Initial Draft of Employment Agreement sent by Mr. Capps.) Regarding the final Agreement, Mike Rein, Epic's co-founder, told Mr. Johnson that he would essentially have to "rape the secretary" to be terminated.

14. The Employment Agreement and related Stock-Options Agreement were not standard employment contracts based on the promise of future services but were a central component of the sale of Artificial Studios and the Reality Engine. Without significant constraints on Epic's ability to terminate Mr. Johnson, he could potentially be deprived of the value of the sale of his highly profitable company. That is why Mr. Johnson personally negotiated the termination provision of his Employment Agreement with Epic's President and founders, and that is why he made it clear that the entire deal was conditioned on Epic agreeing to restrict the grounds on which he could be

terminated.

15. After a month and a half of negotiations, numerous documents related to the sale of Artificial Studios were finalized and arrangements, including a work visa, were made for Mr. Johnson to work for Epic in North Carolina. He began work in May 2005, where he joined Epic's core Unreal Engine team and applied his expertise to improving the Unreal Engine.

16. Mr. Johnson was an exceptional employee with first class programming skills, as demonstrated by his development the Reality Engine. There is nothing in his personnel file indicating any concerns about Tim or his work. Moreover, even if Mr. Johnson were a terrible employee or the relationship were not working out, under the Employment Agreement he could not be fired and deprived of the benefit of the sale of Artificial Studios and the Reality Engine without due process, including written notice and the opportunity to remedy any concerns. Also, as a direct result of negotiations, Epic's discretion in terminating Mr. Johnson for cause was explicitly limited to what was reasonable and in good faith.

17. Nevertheless, shortly before the one-year anniversary of his employment with Epic, when his first round of options would vest and he would be entitled to a $75,000 retention bonus and minimum $40,000 performance bonus,[1] Mr. Johnson was fired for manifestly pretextual reasons. His termination letter mentions no specific or documented concerns or events and merely parrots legal language, stating that Mr. Johnson was guilty of a "material failure to devote your entire professional time, attention, and skill and energies to Epic's business and the responsibilities assigned to you by Epic, a willful and continual failure to substantially perform your duties, gross negligence, and intentional conduct that is potentially materially damaging to Epic's

[1] During negotiations Mr. Johnson was told that his bonus would be closer to a million dollars, which is what other employees at his level actually received. The "at least $40,000" bonus mentioned in the Employment Agreement was pitched to Mr. Johnson as a floor in case Epic had a bad year. In fact, on information and belief, Epic enjoyed record profits (to that date) during the period of Mr. Johnson's employment.

business." (Termination Letter, attached hereto as Exhibit J.)

18. It is not clear whether Mr. Johnson was fired for "political" reasons, or because his personal sensibilities were not in line with Epic's sometimes raucous culture, because certain individuals did not wish to have their stock options diluted, or for some other reason. What is clear is that the firing of Mr. Johnson was entirely contrary to the negotiated "for cause" termination provision of his Employment Agreement and that the termination deprived him of just compensation for the sale of Artificial Studios and assignment of the Reality Engine copyright.

19. Not only did the wrongful termination of Mr. Johnson deprive him of the benefit of the bargain for the sale of his company, it also brought about significant personal and practical turmoil that prevented him from obtaining any remedy for Epic's wrongful conduct. Specifically, as a result of losing his job, Mr. Johnson faced the prospect of deportation because he was in the U.S. on a work visa. He was ultimately able to stay in the United States only because he and his girlfriend decided to marry. Additionally, due to the Non-Compete Agreement Epic required him to sign, Mr. Johnson was quite limited in the employment he could accept, and he was dependent on Epic not interfering with such employment and providing a favorable reference. When Mr. Johnson was finally able to obtain employment, it was in Florida and then California, though Epic required North Carolina as the venue for any dispute.

20. As a young man in a foreign country deprived of his livelihood, Mr. Johnson was not in any position to file a major arbitration in a remote locale requiring significant time and expense. However, time has not diminished the harm caused by Epic's wrongful conduct, and Mr. Johnson is now a position to seek redress. North Carolina recognizes this as his right pursuant to an agreement to arbitrate disputes. *See Cameron v. Griffiths*, 91 N.C. App. 164; 370 S.E.2d 704 (1988) ("The parties' contract does not limit the period in which arbitration can be demanded and no statute or court decision of this State of which we are aware does so either.") Thus, Mr. Johnson brings this action to hold Epic accountable and to obtain a remedy for that which he has been

unjustly deprived.

## FIRST CAUSE OF ACTION

## (Breach of Written Contract)

21. Claimant incorporates herein by reference paragraphs 1 through 20 in their entirety.

22. Timothy Fredrick Murphy-Johnson and Epic Games, Inc. entered into an Employment Agreement in May 2005, pursuant to which Epic agreed to employ Mr. Johnson and agreed not to terminate him except for cause, as detailed in the contract. The Employment Agreement was part of a series of Agreements, including a Stock Option Agreement, pursuant to which Mr. Johnson sold his company, Reality Studios, and assigned its primary product, the Reality Engine, to Epic Games, Inc.

23. Epic Games breached the Employment Agreement by terminating Mr. Johnson without cause and by failing to compensate him with salary, bonuses, and stock rightfully owed under the Employment Agreement and related Agreements

24. Mr. Johnson performed all obligations under the Employment Agreement and related agreements except those obligations Mr. Johnson was prevented or excused from performing.

25. Mr. Johnson suffered damages legally and proximately caused by Epic's breach as follows: Mr. Johnson was denied stock totaling approximately 1% of Epic's outstanding shares (a value of approximately $7,000,000 as of 2012), bonuses of at least $4,000,000, and unpaid salary of at least $300,000. Mr. Johnson was also wrongfully deprived of his copyright to the Reality Engine.

26. Mr. Johnson suffered special and consequential damages as a result of Epic's wrongful termination and breach of contract, including emotional distress, damage to his reputation, employment prospects, and loss of his business without compensation.

## SECOND CAUSE OF ACTION

## (Breach of Covenant of Good Faith and Fair Dealing)

27. Claimant incorporates herein by reference paragraphs 1-26 in their entirety.

28. North Carolina law implies a covenant of good faith and fair dealing between parties to contracts.

29. Mr. Johnson performed its duties to Epic under his Employment Agreement and related Agreements, except when such good faith performance was frustrated by Epic or its agents or executives.

30. The actions of Epic in terminating Mr. Johnson in a manner inconsistent with his Employment Agreement were made in bad faith and/or reckless disregard of the Employment Agreement, unfairly deprived Mr. Johnson of the benefit of the sale of Artificial Studios and the Reality Engine, and constituted a breach of the covenant of good faith and fair dealing. The termination of Mr. Johnson in violation of his Employment Agreement further deprived him of his rights as a contractual partner to the Agreements and as a legally entitled minority shareholder of Epic.

31. Claimant has sustained damages as a direct and proximate result of the aforementioned breach by Epic of the implied covenant of good faith and fair dealing in an amount that will be proven.

**THIRD CAUSE OF ACTION**

**(Breach of Fiduciary Duty)**

32. Claimant incorporates herein by reference paragraphs 1-31 in their entirety.

33. Epic, by and through its agents and executives, breached its fiduciary duties to Mr. Johnson as a minority shareholder under the terms of his Employment Agreement, Stock Option Agreement, and related Agreements.

34. By failing to honor the terms of his Employment Agreement, Stock Option Agreement, and related Agreements, majority shareholders of Epic, including Mr. Capps and Mr. Sweeney, took advantage of claimant in his capacity as a legally entitled minority shareholder and breached their fiduciary duties of good faith, care, and diligence and used their majority position to take advantage of claimant to his injury.

35. The actions of the majority shareholders were not made for legitimate business reasons and did not constitute the exercise of good corporate judgment.

36. Claimant has sustained damages as a direct and proximate result of the aforementioned breach of their fiduciary duties by Epic and its majority shareholders to claimant in an amount that will be proven.

**PRAYER FOR RELIEF**

WHEREFORE, Claimant prays for judgment against Respondent and for injunctive and monetary relief as follows:

1. For a declaration that Epic Games, Inc. willfully breached Tim Johnson's Employment Agreement;
2. That Mr. Johnson be awarded damages for respondent's breach of at least $11,300,000, representing the value of stock, bonus, and other payments due Mr. Johnson under the Employment Agreement, or, in the alternative, that Mr. Johnson be awarded 1,966 shares of undiluted stock in Epic Games, Inc. and $4,300,000 in other payments due;
3. That any copyright or other intellectual property assignment from Mr. Johnson or Artificial Studios to Epic be declared null and void;
4. That Mr. Johnson be awarded the lost profits of Artificial Studios;
5. That Mr. Johnson be awarded punitive damages for conduct that reflects fraud, deceit, or malicious behavior;
6. That Mr. Johnson be awarded prejudgment and post-judgment interest;
7. That the arbitrator award costs of suit incurred herein, including attorneys' fees;
8. For such other and further relief as the arbitrator may deem proper.

Dated: 3/7/14

MCGOWAN, HOOD & FELDER, LLC

Chad A. McGowan
Attorneys for Claimant
Timothy Johnson